# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO.: 3:02CV205-V

| | | |
|---|---|---|
| **RAMSEY REED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **BUCKEYE FIRE EQUIPMENT** | ) | |
| **COMPANY and BRIAN BOWER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment, both filed September 30, 2004.  On October 25, 2004, Plaintiff filed his Response to Defendants Motion' for Summary Judgment. Defendants filed a Reply on November 12, 2004.  This Motion is now ripe for disposition by the Court.

Having carefully considered the record, the arguments, and the applicable authority, for the below stated reasons the Court will <u>grant</u> Defendants' Motion for Summary Judgment.

## I.  FACTUAL AND PROCEDURAL HISTORY

For purposes of this Motion for Summary Judgment, the Court accepts the following facts taken in the light most favorable to Plaintiff as true.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Defendant Buckeye Fire Equipment Company ("Buckeye") was founded in 1969 in Cleveland, Ohio, and moved to Kings Mountain, North Carolina in 1975.  (T. Bower Dep. p. 6).

Tom Bower and his two sons, Kevin Bower and Defendant Brian Bower, are the sole owners of Buckeye. (*Id.* p. 11). Tom Bower is Buckeye's President, while Kevin Bower and Brian Bower are Vice Presidents of Operations and Sales respectively. ( *Id.* pp. 66-68). Buckeye manufactures fire fighting equipment, including portable and wheeled fire extinguishers, dry chemical powders, foam concentrates, and foam hardware. (*Id.* p. 12). The portable canned fire extinguisher, however, constitutes the bulk of Buckeye's business. (*Id.* pp. 113-14, 120-21).

On March 14, 1994, Tom Bower hired Plaintiff Ramsey Reed ("Plaintiff" or "Reed") to serve as General Manager. (Reed Dep. pp. 45-47). Tom Bower hired Reed to assume the duties of then-President Neil Hoogmoed. (Reed Dep. p. 46; T. Bower Dep. p. 23). Both Tom Bower and Reed were 48 at the time of Reed's hiring. (Reed Dep. pp. 39-40; T. Bower Dep. p. 122). As General Manager, Reed was responsible for supervising manufacturing operations and engineering at the Buckeye facility. (Reed Dep. pp. 69-70, 45-47). In this position Reed had five (5) managers and 80 non-management production line employees who reported directly to him. ( *Id.* pp. 69-70). Tom and Kevin Bower were in the best positions to evaluate Reed's performance while he was General Manager. (*Id.* p. 44).

There are significant disputes between Plaintiff and Defendants regarding Reed's performance as General Manager. Defendants contend that Reed was unable and unwilling to assume the responsibilities of General Manager, while Plaintiff argues that his performance in this position was satisfactory, as evidenced by the fact that he received no warnings or discipline for poor performance and, in fact, received multiple performance bonuses. (Pl. Resp. p. 19). In

any event, on December 2, 1996, Reed was reassigned to the position of Head of Engineering.[1]

For the next four years, while acting as the Head of Engineering, Reed was directly responsible for acquiring, installing, making operational and maintaining several automated assembly lines relating to the manufacture of fire extinguishers. (K. Bower Dep. Exh. 3). After his reassignment to Head of Engineering, Reed only had one direct report, engineer Don Herrington. (Reed Dep. p. 108). While in this position, Reed was never reprimanded for poor performance and all feedback he received was positive. (Pl. Resp. pp. 18-19; 33).

Despite the lack of negative feedback, Defendants contend that Reed's performance as Head of Engineering had significant deficiencies. (T. Bower Dep. pp. 26-33; K. Bower Dep. pp. 15-25, 48, 54-58, 122-23; H. Corbin Dep. pp. 37-39, 43-47). In sum, Defendants maintain that virtually every engineering project for which Reed was responsible did not work as promised, had serious engineering design issues, caused delays and interruptions in production, and/or resulted in financial loss to Buckeye. (Defs.' Mem. in Supp. pp. 8-9). Defendants further opine that Reed's work habits and the way in which he conducted himself at work was a constant source of irritation for both management and other employees. (*Id.* p. 9).

On January 25, 2001, while on his way to work at Buckeye, Plaintiff was in an automobile accident. (Reed Dep. p. 199; Pl. Resp. p. 6). As a result of this accident, Plaintiff suffered serious injury to his leg, which required immediate surgery. (Pl. Resp. p. 6). Reed's wife called Buckeye that same day and told Kevin Bower about Plaintiff's accident. (Reed Dep. p. 200).

---

[1] Defendants state that moving Plaintiff from General Manager to the Head of Engineering was a demotion for Reed, but in order to preserve Reed's morale, the Company did not announce the reassignment as such. (Defs' Mem. In Supp. p. 7). Plaintiff argues that this job change was not a demotion but rather he was reassigned due to his success in solving engineering problems. (Reed Dep. pp. 105-10; Pl. Resp. p. 17).

Reed did not personally speak to Kevin Bower until he was released from the hospital on January 28, 2001, at which time Reed advised Kevin that he would be out of work for at least two months.[2] (*Id.* pp. 202-04). At that time, Reed only had two weeks of vacation leave available. (*Id.* p. 202). Despite this minimal amount of accrued leave, Reed did not believe that he would be taking any formalized leave during his two month absence. (*Id.* p. 203). Moreover, Reed contends that during the January 28, 2001 conversation, Kevin Bower never mentioned that Reed was required to take a specific type of leave. (*Id.*).

In February 2001, Reed arranged for a neighbor to drive him to work twice a week, and planned to start back working at Buckeye part-time in late February. (*Id.* p. 202). Reed's neighbor took him to work on February 23, 2001, in order for Reed to attempt to repair two of Buckeye's machines. (*Id.* p. 213). While at work, however, Reed's leg began to swell and he developed a blood clot, which required hospitalization and ended his plan to work part-time. (*Id.*).

In early April 2001, Plaintiff purchased a truck and began driving again. (*Id.* p. 224). On April 19, 2001, Reed visited Eric Laxer, M.D. for a checkup. Dr. Laxer believes that as of April 19, 2001, Reed could have returned to work. (Laxer Aff. ¶ 8). Despite Dr. Laxer's belief, though, on April 27, 2001, Reed notified either Howard Corbin or John Classic that he did not intend to return to work until May 7, 2001. (Reed Dep. pp. 215-16).

During Reed's absence, Tom and Kevin Bower had numerous conversations regarding

---

[2]Defendants contend that Reed called Kevin Bower the day after the accident, January 26, 2001, and reiterated what Reed's wife had reported the previous day. (K. Bower Dep. p. 72). Subsequent to this conversation, Kevin Bower claims that he sent a letter to Reed, notifying Reed that his medical leave was being designated pursuant to the Family and Medical Leave Act ("FMLA") and advising Reed that the FMLA allowed him up to twelve weeks of leave. (*Id.* pp. 64-65). Plaintiff claims that he did not speak with Kevin Bower on January 26, 2001, and further maintains that he never received any such letter. (Reed Dep. pp. 63-67).

Reed's performance, particularly with regard to problems that Buckeye was experiencing in the engineering projects for which Reed was directly responsible. (T. Bower Dep. pp. 83-93, 123-24; K. Bower Dep. pp. 104-05, 110-12, 122-24). When questioned by his father during these conversations about why Buckeye had retained Reed, Kevin Bower expressed his unwillingness to terminate Reed because Buckeye had invested too many years in him, Reed was familiar with the Company's products, and Kevin was simply unable to bring himself to terminate Reed's employment. ( *Id.*). Morever, during Reed's twelve week absence, the Company determined that Reed had not added value to Buckeye, as evidenced by the fact that Kevin Bower and Howard Corbin were able to assume Reed's duties without a significant impact on their workload. (K. Bower Dep. pp. 110-11). In sum, during Reed's absence, Tom and Kevin Bower could think of nothing "that [Buckeye was] actually losing on a day-to-day basis, whether it was production or fixing machinery." ( *Id.* p. 105).

Consequently, Tom Bower decided that it would be best to terminate Reed's employment because his errors at work had cost Buckeye too much money, with little or no return benefit to the Company. (T. Bower Dep. pp. 83-86; Reed Dep. pp. 216-17). Thus, on April 30, 2001, Tom Bower called Reed and told him that his employment was being terminated for inadequate job performance. (Reed Dep. pp. 216-17). Tom Bower did not tell Reed that he was being terminated because of his age or for taking FMLA leave, and, in fact, Tom gave no indication of such motivation. ( *Id.*).

On December 11, 2001, Buckeye received a letter addressed to Tom Bower from Reed's attorney, alleging that the Company had violated Reed's FMLA rights and demanding payment of $120,000. (Reed Dep. Exh. 21). The letter further stated that if such payment was not made,

Reed would file a lawsuit against Buckeye. ( *Id.*).  Tom Bower instructed Brian Bower to handle this letter because, in addition to his duties as Vice President of Sales, Brian is also responsible for most of Buckeye's legal matters. (B. Bower Dep. pp. 8-9, 23; T. Bower Dep. p. 99).

On his own initiative, Brian Bower decided to call Reed in regard to this demand letter. (Reed Dep. pp. 228-30; B. Bower Dep. pp. 8-10, 22-23; T. Bower Dep. p. 99).  Although the details of the conversation between Brian and Reed are in dispute,[3] Reed admits that regardless of what was said, the conversation did not prevent, obstruct, impede, or hinder him in his plan to sue Buckeye. (Reed Dep. p. 230).

Subsequently, on April 2, 2002, Reed filed the instant lawsuit, alleging three causes of action: (1) violation of the Family and Medical Leave Act, 29 U.S.C. § 2601,  *et seq.*, brought against Buckeye; (2) wrongful discharge in violation of public policy, brought against Buckeye; and (3) obstruction of justice and civil conspiracy brought against Defendant Brian Bower. Defendants now seek to have the Court dismiss all three claims on the basis that there is no disputed genuine issue of material fact and Defendants are entitled to judgment as a matter of law.

## II.  DISCUSSION

### A.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the

---

[3]Reed contends that Brian Bower threatened to show Reed's wife correspondence from another woman that Brian found in Reed's desk unless Reed agreed to not file the lawsuit (Pl. Resp. pp. 10-11).  Brian argues that he never made any such threat. (B. Bower Dep. p. 99).

moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. However, the party opposing summary judgment may not rest upon mere allegations or denials, and a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249-50. Moreover, when the movant supports its motion for summary judgment by affidavits, the adverse party may not rest upon the mere allegations or denials of their pleadings, but the adverse party's response must be supported by affidavits or as otherwise provided by Rule 56 and must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

Courts, in considering motions for summary judgment, view the facts and inferences in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255; *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1998); *Cole v. Cole*, 633 F.2d 1083 (4th Cir. 1980). Summary judgment is thus proper where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).

**B.      The Family and Medical Leave Act**

In 1993, Congress enacted the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA"), in an attempt to assist employees in balancing work and family life. 29 C.F.R. § 825.101. The FMLA provides employees with a reasonable amount of leave to care for their families or their own medical needs without ignoring the legitimate demands of the workplace. 28 U.S.C. § 2601. To that end, the FMLA guarantees eligible employees 12 weeks of leave in a

one-year period following certain events: a disabling health problem, a family member's serious illness, or the arrival of a child. 29 U.S.C. § 2612(a)(1). During this 12 week leave period, the employer is required to maintain the employee's group health coverage and upon the employee's timely return, the employer must reinstate the employee to his former position or an equivalent position. 29 U.S.C. §§ 2614(c)(1), (a)(1).

In addition to providing the 12 weeks of leave, an employer is also required to notify his employees of their rights under the FMLA. 29 C.F.R. §§ 825.301, 825.208(a), (b)(1), (2); *see also Kelso v. Corning Cable Sys. Int'l Corp.*, 224 F. Supp. 2d 1052, 1057 (W.D.N.C. 2002) (noting that "[a]ll that the FMLA requires is a maximum of 12 weeks' FMLA leave and the posting of a notice of such statutory rights"). Specifically, once an employer knows that an employee is taking leave for an FMLA required reason, "the employer must promptly (within two business days absent extenuating circumstances) notify the employee that the paid [or unpaid] leave is designated and will be counted as FMLA leave," and detail the specific expectations and obligations of the employee, as well as the consequences of the employee's failure to meet those obligations. 29 C.F.R. §§ 825.208(b)(1), 825.301(b)(1).

Pursuant to the FMLA, it is unlawful for an employer "to interfere with, restrain, or deny the exercise of these rights." 29 U.S.C. § 2615(a)(1). Notably, "*[a]ny* violations of the Act or of [the] regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.220(b) (emphasis added). However, even if an employer violates the FMLA regulations or statute, there is no relief unless the employee is prejudiced by the violation. 29 U.S.C. §§ 2615, 2617; *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81,

89 (2002).[4]  Therefore, in order for a plaintiff to maintain an FMLA claim, he must establish both

an interference, restraint, or denial of his FMLA rights *and* a resulting prejudice.

In the instant case, it is undisputed that Plaintiff received more than 12 weeks of leave

between January 25, 2001 and his termination on April 30, 2001. (Reed Dep. pp. 205-06).

Plaintiff, however, contends that Defendant Buckeye violated the FMLA by failing to notify him

that his absence was designated pursuant to the FMLA and subsequently terminating his

employment while he was still protected by the statute.  (First Am. Compl. ¶ 17; Pl. Resp. pp. 24-

25).[5]

### 1.    January 26, 2001 Letter

Defendants state that after they were advised on January 25, 2001 of Plaintiff's need for

extended leave from work, the following day, January 26, 2001, Kevin Bower sent Reed a letter

notifying him that his leave was being designated pursuant to the FMLA. (Defs.' Mem. in Supp.

p. 18) (*citing* K. Bower dep. pp. 63-65; Reed Dep. pp. 204-06 and Exh. 19).  This January 26,

---

[4]Both parties discuss in detail the decision by the United States Supreme Court in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002).  In *Ragsdale,* the Supreme Court discussed the implications of 29 C.F.R. § 825.700(a), which provides that if the employee takes medical leave "and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement."  The Supreme Court held that this regulation "effects an impermissible alteration" of the FMLA statutory framework and was outside the Secretary's power to issue regulations "necessary to carry out" the FMLA.  *Ragsdale*, 535 U.S. at 96.  Notably, Plaintiff here does not rely on the regulation at issue in *Ragsdale*, but rather cites to 29 C.F.R. §§ 825.208(b)(1) and 825.301(b)(1) as the regulations violated by Buckeye. (Pl. Resp. pp. 24-25).  Consequently, the Court will not address the application of the *Ragsdale* decision to the instant case, except to note that an employer's lack of notice does not result in compensation to the employee unless such employee can show that the lack of notice interfered with or restrained his rights under the FMLA and that the employee suffered prejudice as a result.  *Ragsdale*, 535 U.S. at 88.

[5]The FMLA recognizes two types of claims for alleged violations of the statutory provisions: (1) interference claims, where the employer denies substantive statutory rights to which the employee is entitled; and (2) retaliation claims, in which the employer discharges an employee for exercising his FMLA right to leave.  29 U.S.C. §§ 2615(a)(1), (a)(2).  In the instant case, a review of Plaintiff's Complaint and Response to Defendants' Motion for Summary Judgment leads the Court to conclude that Plaintiff is asserting an inference claim and not a retaliation claim.  (Am. Compl. ¶ 17; Pl. Resp. pp. 24-29).

2001 letter advised Plaintiff that he had 12 weeks of leave under the FMLA. (Reed Dep. Exh. 19).

Plaintiff maintains that he did not receive the January 26, 2001 letter. (Reed Dep. pp. 204-06). Not only does Plaintiff make this denial but his attorney even goes so far as to accuse Defendants of fabricating evidence in the form of the January 26, 2001 letter. (Pl. Resp. p. 2).[6]

Notably, Plaintiff's attorney levels these accusations against Defendants and their attorneys without any evidence. (Pl. Resp. pp. 2, 8). Pure speculation and conjecture are certainly not sufficient grounds for one attorney to accuse another of using fabricated evidence in defense of a lawsuit, especially in light of evidence to the contrary. Significantly, Kevin Bower testified that he sent the January 26, 2001 letter to Reed to notify him that, pursuant to the FMLA, Reed was entitled to 12 weeks of medical leave. (K. Bower Dep. p. 64). Plaintiff's counsel did not ask Kevin Bower what date this document was created. Instead, Plaintiff's

---

[6]Specifically, counsel for Plaintiff alleges as follows:

> Defendants show a brazen willingness to fabricate evidence, including a Federal Medical Leave Act ("FMLA") notice document devised *after* the lawsuit was filed. Plaintiff alleges that Buckeye violated the FMLA when it did not provide him notice that he was on FMLA leave and had certain rights, and then fired him while he was absent due to an injury. On April 22, 2004 [sic], the Defendants received this Complaint. Thomas Bower then created at his home computer on April 29, 2002 an unsigned letter from Kevin Bower to plaintiff stating that he was on FMLA leave for 12 weeks. Defendants then presented that document in discovery, claiming that it was mailed to plaintiff on January 26, 2001. . . . Their brief does not address the evidence showing that Buckeye created a false document to defend against the lawsuit. . . .

> The only copy of the letter produced in discovery is an unsigned one with a fax stamp showing that it was sent from Thomas Bower's home fax on April 29, 2002, seven days after Bower was served with the lawsuit. Thomas Bower confirmed that the number on the document is his home fax number. T.B. p. 117. He also confirmed that he has a home office, that his wife serves as his secretary and she had access to a computer at their home. *Id.* pp. 78-79.

> In the light most favorable to plaintiff, the powerful inference is that Bowers created this letter one week after receiving the lawsuit and reading the allegation that Buckeye had failed to provide Plaintiff written notice of his FMLA rights. . . .

(Pl. Resp. pp. 2, 8).

attorney made his own unsupported accusation against the Defendants using a fax line appearing at the top of the letter.  However, as testified to by Thomas Bower, the fax line on top of the January 26, 2001 letter reflects nothing more than the fact that the letter was sent from someone at Buckeye to Thomas Bower's home fax machine on April 29, 2002, or that Thoms Bower faxed a copy of the letter to Buckeye on April 29, 2002.  (T. Bower Dep. pp. 76-77).  Further, Thomas Bower testified that he was not the author of the January 26, 2001 letter and stated that all FMLA notices are handled either by Buckeye's Personnel Department or by Kevin Bower. ( *Id.* pp. 77, 79-80).  This fax line does *not* support the unfounded theory that the letter was actually created on April 29, 2002.  In fact, all of the *evidence* in the record supports a finding that the letter was created on January 26, 2001.  The fact that Reed alleges that he never received the letter does not support counsel's theory of unethical behavior on the part of Defendants and their attorneys.

This Court does not take lightly accusations of unethical behavior by one attorney against a party or another attorney.  Thus, when such accusations are made without any supporting evidence, the Court finds it difficult to refrain from immediately imposing Rule 11 sanctions against the accuser.  However, instead of ordering Rule 11 sanctions the Court issues a stern warning to Plaintiff's counsel that any further unsupported accusations of unethical behavior against an opposing party or attorney, in this case or any other, will result in swift consequences from this Court.

With regard to the letter dated January 26, 2001, and its role in the instant Motion, since all facts are taken in the light most favorable to Plaintiff and Reed states that he did not receive the letter, the Court will presume for purposes of this Motion only that Reed did not receive

notice that his leave was classified under the FMLA. In the absence of additional evidence, the Court will not further discuss or entertain Plaintiff's counsel's baseless accusations of unethical behavior by Defendants or their attorneys.

## 2. <u>Interference, restraint, or denial of FMLA rights</u>

It is unlawful for an employer "to interfere with, restrain, or deny the exercise of" an employee's rights under the FMLA. 29 U.S.C. § 2615(a)(1). As noted above, the Court will presume for purposes of Defendants' Motion that Plaintiff did not receive the letter dated January 26, 2001, nor any other notice from Buckeye that his absence constituted leave under the FMLA.[7] Notably, "*[a]ny* violation of the Act or of [the] regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.220(b) (emphasis added). Consequently, since taken in the light most favorable to Plaintiff, Buckeye failed to notify Reed that his absence was classified pursuant to the FMLA, Defendant Buckeye failed to adhere to the notice requirements outlined in the FMLA regulations thereby interfering with, restraining, or denying Reed's FMLA rights.

However, even though the Court concludes for purposes of this Motion that Plaintiff's FMLA rights were violated by Defendant Buckeye's failure to provide proper notice, Plaintiff must still establish that he was prejudiced by this interference.

---

[7]Even though the Court presumes Plaintiff did not receive the January 26, 2001 letter, the Court finds it notable that Reed admitted that he knew the FMLA statute existed and acknowledged that Buckeye "responded to whatever the law was in regards to" family and medical leave. (Reed Dep. p. 64). Reed further testified that he knew Buckeye had a bulletin board where the Company posted important notices, but admitted that he did not pay attention to it, despite the fact that he passed it on at least a daily basis. (*Id.* pp. 65-66). Moreover, despite his knowledge of the FMLA, Reed did not feel it necessary to find out the details of this statute because he was a "salaried employee," although Plaintiff further admits that salaried employees are not entitled to unlimited leave. (*Id.* p. 203). Additionally, as a former General Manager of Defendant Company, it is plausible that Plaintiff would have bene responsible for knowing the framework of the FMLA.

### 3.    **Prejudice resulting from FMLA violation**

The FMLA provides no relief to an employee where his employer interfered with his FMLA rights unless the employee can establish that he was prejudiced by this violation. 29 U.S.C. §§ 2615, 2617; *Ragsdale*, 535 U.S. at 89. To satisfy his burden, the employee must show a "real impairment of [his] rights and resulting prejudice." *Ragsdale*, 535 U.S. at 90. Only if the employee establishes such prejudice is the employer liable for compensation and benefits lost "by reason of the violation," for monetary losses occurring "as a direct result of the violation," and for "appropriate equitable relief, including employment, reinstatement, and promotion." 29 U.S.C. § 2617. Therefore, the question for this Court to answer is whether there is a triable issue of fact as to whether the lack of notice by Buckeye prejudiced Plaintiff so as to prevent him from exercising his right to return to work at the end of the twelve weeks.

Plaintiff contends that he was prejudiced by the lack of notice because if he had received the requisite notice, "he could have returned to work within the twelve weeks." (Pl. Resp. p. 28). Such contention assumes, however, that Plaintiff would not have been fired if he returned within the 12 weeks. As stated above, though, Plaintiff was not terminated for his failure to return from FMLA leave, but rather his employment was terminated due to his poor performance. (Reed Dep. pp. 216-17; T. Bower Dep. pp. 83-86).

Significantly, an employee's termination subsequent to taking FMLA leave is not a *per se* violation of the FMLA. In fact, an employee who takes FMLA leave is not entitled to "any right, benefit or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Notably, "[a]n employee has no greater right to reinstatement or to other benefits

13

and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). However, the employer must be able to show that the employee would not have been employed at the time of reinstatement in order to deny restoration to employment. (*Id.*).

Here, Plaintiff was terminated for inadequate job performance, not for his failure to return to work after 12 weeks. (Reed Dep. pp. 216-17). Plaintiff would have been terminated even if he had not taken FMLA leave. In fact, Thomas Bower intended to terminate Plaintiff's employment prior to Reed taking FMLA leave. (T. Bower Dep. pp. 83-86; 123-24). Plaintiff has no evidence to contradict Thomas Bower's intentions. In light of the fact that Plaintiff received all leave to which he was entitled and would have been terminated for poor performance regardless of whether he took FMLA leave, there is no evidence of prejudice to Plaintiff as a result of Defendant Buckeye's failure to provide the requisite FMLA notice. [8] Consequently, Defendant Buckeye is entitled to summary judgment on Plaintiff's FMLA claim.

## C.     Wrongful Discharge in Violation of Public Policy

Reed's second cause of action alleges that Buckeye wrongfully discharged him due to his age, in violation of the public policy set forth in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2 ("NCEEPA"). The NCEEPA provides, in pertinent part, as follows: "It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on

---

[8]The Court reiterates that Plaintiff received everything to which he was entitled - 12 weeks of leave. In fact, Plaintiff did not intend to return until May 7, 2001, which was over fourteen weeks after his leave began. (Reed Dep. pp. 201, 206-09). At the time that Plaintiff's employment was terminated, he had received over thirteen weeks of leave. Therefore, it is difficult to see how Defendant Buckeye's lack of notice resulted in prejudice to Reed. To find such prejudice would be elevating form over substance.

account of . . . age . . . by employers which regularly employ 15 or more employees." N.C. Gᴇɴ. Sᴛᴀᴛ. § 143-422.2.  In determining the parameters of this claim, the North Carolina Supreme Court has found that courts should follow the principles established in federal discrimination cases.  *See North Carolina Dept. of Correction v. Gibson*, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983) (adopting evidentiary standards and principles of law set forth in Title VII to analyze plaintiff's NCEEPA claim of race discrimination).  In the context of age discrimination, the applicable federal law is the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA").

### 1.      Standard of proof for ADEA claim

The Fourth Circuit recognizes two avenues of proof by which an employee may establish an ADEA violation: (1) through direct or indirect evidence of discrimination; or (2) through the burden-shifting scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Regardless of the proof scheme used, though, "'[t]o establish a claim [pursuant to the ADEA], a plaintiff must prove, with reasonable probability, that but for the age of the plaintiff, the adverse employment decision would not have been made.  Age must have been a determining factor in the employment decision.'"  *Bishop v. Peppertree Resorts, Ltd.*, 212 F. Supp. 2d 518, 522 (W.D.N.C. 2002) (*quoting Mitchell v. Data General Corp.*, 12 F.3d 1310, 1314 (4ᵗʰ Cir. 1993)). Moreover, the existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 943 (4ᵗʰ Cir. 1992).  "In short, a finding of age discrimination would 'only be an outright conjecture and not by any rational assessment of probabilities.'"  *Clay Printing*, 955 F.2d at 943 (*quoting Lovelace v. Sherwin-Williams Co.*, 681

F.2d 230, 243-44 (4th Cir. 1982)).

There is no dispute in the case at bar that Plaintiff cannot establish age discrimination through the use of direct or indirect evidence. (Defs.' Mem. in Supp. p. 34; Pl's Resp. p. 32). Thus, Plaintiff must rely on the *McDonnell Douglas* proof scheme to prove his claim of age discrimination.

Under the *McDonnell Douglas* scheme, once a plaintiff proves a *prima facie* case of discrimination, the burden of producing a legitimate, nondiscriminatory reason for the adverse action shifts to the defendant. *Bishop*, 212 F. Supp. 2d at 522. If the defendant articulates a legitimate, nondiscriminatory rationale, which, if believed to be true by the trier of fact would support the conclusion that discrimination was not a determining factor in taking the adverse employment action, the presumption created by the *prima facie* case drops out of the picture and the plaintiff bears the ultimate burden of proof to establish that the defendant's rationale is actually pretext for discrimination. *Id.* "To make this demonstration, the employee must show that as between the plaintiff's age and the defendant's explanation, age was the more likely reason for the dismissal, or that the employer's proffered explanation is simply unworthy of credence." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996).

## 2.   Plaintiff's *prima facie* case of age discrimination

The plaintiff has the initial burden of establishing a *prima facie* case of age discrimination. In sum, to establish a *prima facie* case of age discrimination with circumstantial evidence, the plaintiff must prove a set of facts which would enable the fact-finder to conclude with reasonable probability that *in the absence of any further explanation*, the adverse employment action was the product of age discrimination. *Bishop*, 212 F. Supp. 2d at 522

16

(*quoting Mitchell*, 12 F.3d at 1315).

A *prima facie* case of discrimination requires a plaintiff to establish that: (1) he was in the protected age group; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) following the discharge, he was replaced by a substantially younger individual. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959-60 (4th Cir. 1996); *Bishop*, 212 F. Supp. 2d at 522. Here, there is no dispute that Plaintiff can and has established the first two elements of his *prima facie* case. However, there is a dispute between Defendants and Plaintiff as to whether he can establish the third and fourth elements.

### 3.     Meeting employer's legitimate job expectations

Evidence of whether an employee was meeting his employer's job expectations at the time of his termination must be both focused and probative. *King v. Rumsfeld*, 238 F.3d 145, 149 (4th Cir. 2003). To overcome summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact. *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988). Consequently, a plaintiff's "unsubstantiated allegations and bald assertions concerning [his] own qualifications" fail to establish discrimination. *Evans,* 80 F.3d at 960. "The reason for carefully screening a plaintiff's evidence and requiring a plaintiff to present substantial, rationally probative evidence arises because discrimination cases present a special danger." *Ploplis v. Panos Hotel Group, L.L.C.*, 267 F. Supp. 2d 487, 493 (M.D.N.C. 2003).

Here, Defendant Buckeye contends that at the time of his discharge, Plaintiff was not

meeting the Company's legitimate job expectations, and had not been meeting such expectations for years. (Def. Mem. in Supp. p. 38). The Company expected Plaintiff to "competently handle machine and engineering issues and to conduct himself as a manager should." ( *Id.*). Despite these expectations, both Plaintiff's work habits and personal conduct were not remedied even though there were ample opportunities for Plaintiff to modify his behavior. ( *Id.*). Defendants provide a litany of complaints against Plaintiff and how his work performance caused financial difficulties for the Company. (*Id.* pp. 8-16).

In response, Plaintiff argues that his performance was meeting Buckeye's expectations. In support, Plaintiff points to a 1994 memo, issued by the Company, stating that Reed's redesign of an "o-ring" used on portable fire extinguishers had been incorporated into the Company's manufacture of fire extinguisher canisters. (Pl. Resp. p. 15) ( *citing* Reed Dep. pp. 75-81; K. Bower Dep. Exh. 2). Plaintiff further relies on a statement made by Thomas Bower to the effect that 1995 was the best in company history and Plaintiff's redesign had increased sales and market share, while reducing warranty claims. ( *Id.*) (*citing* Reed Dep. pp. 75, 82). Plaintiff notes that as a result, in 1995, Thomas Bower paid Plaintiff a $4,800 bonus. ( *Id.*).

Also in 1995, Plaintiff began working on automating the process of filling extinguishers using a mechanized fill-line. (Reed Dep. pp. 176-80). According to Plaintiff, the fill-line project was completed in 1998, which resulted in the Company boasting that it was "'the most automated dry chemical filling operation worldwide.'" (Pl. Resp. p. 17 ) ( *citing* T. Bower Dep. Exh. 1). Plaintiff contends that he received bonuses in 1997 and 1998 for his efforts in creating the fill-line. (*Id.*).

In regard to his transition to Head Engineer in 1996, Plaintiff maintains that this move

was not a demotion but rather was a result of his success in solving engineering problems and Kevin Bower's move into the position of Vice President of Operations. (*Id.*). Plaintiff states that Ed Smart did not replace him as General Manager but instead received the title of Plant Manager and was assigned duties entirely different from Plaintiff's. ( *Id.* pp. 17-18). Plaintiff further notes that in order to induce him to stay at Buckeye, he received a $2,000 pay rase. (*Id.* p. 19). Plaintiff argues that he did not receive any written warnings and all verbal feedback he received was positive, which Plaintiff contends negates Defendant Buckeye's argument that he was having performance issues in 1996. (*Id.*) (*citing* Reed Dep. pp. 84-85).

In response, Defendants note that although the Company did not announce that Plaintiff's job reassignment constituted a demotion, the circumstances support a finding that Plaintiff was demoted in his move from General Manager to Head of Engineering. For example, Plaintiff's supervisory responsibility shrunk from 85 direct reports to one direct report, he was no longer equivalent to the President but was subordinate to both the President and the Vice President of Operations, and his responsibilities were qualitatively diminished. (Defs.' Mem. in Supp. p. 7). Buckeye admits, however, that in order to convince Plaintiff to stay, the Company gave him a salary increase of $2,000 to $3,000. (*Id.* p. 8) (*citing* Reed Dep. pp. 111-12; Reed Dep. Exh. 7).

### a.     *Plaintiff's performance as Head of Engineering*

For the next four years as Head of Engineering, Plaintiff was "directly responsible for acquiring, installing, making operational and maintaining several important automated assembly lines relating to the manufacture of the Company's core product: fire extinguishers." ( *Id.*). Accordingly, the significant projects for which Reed was responsible included an automated fire extinguisher welding line, a pressure gauge assembly machine, an Italian-made cylinder fill line

labeling machine, and an Italian cylinder fill line box assembly machine.  ( *Id.*) (*citing* T. Bower Dep. pp. 24-25; K. Bower Dep. pp. 17-25, 122-23).  Defendants note that "virtually every engineering project for which the Plaintiff was responsible either did not work as the Plaintiff had promised, had serious engineering design issues, caused delays and interruptions in production and/or caused financial losses to the Company due to the money that had to be spent modifying the machine or replacing parts that never worked." [9]  (*Id.* pp. 8-9) (*citing* T. Bower Dep. pp. 26-33, 39-40; K. Bower Dep. pp. 17-25, 48, 54-57, 122-23; H. Corbin Dep. pp. 23, 37-39, 43-47).  Plaintiff admits that while he was Head of Engineering, Kevin Bower was in the best position to evaluate Reed's performance.  (Reed Dep. p. 44).

### i.    Automated fire extinguisher welding line

In 1997 Buckeye decided to implement a system that would enable the Company to use automation to weld fire extinguisher cylinders.  (Defs.' Mem. in Supp. p. 9) ( *citing* Reed Dep. pp. 142-45, 150).  As Head of Engineering Plaintiff was responsible for this project.  ( *Id.* p. 9) (*citing* Reed Dep. p. 153).  Thomas Bower outlined clear goals for Plaintiff with regard to this project: the weld line had to produce four welded cylinders per minute, or 240 per hour, and the project needed to pay for itself in three years. (*Id.* p. 10) (*citing* Reed Dep. pp. 144-45, 150). Despite the Company's expectations, this project had numerous problems.  The first problem with the weld line was the delivery date. (*Id.*).  Plaintiff was to ensure that the finished weld line would be delivered within 20 to 22 weeks, but after 18 months, the weld line had not been delivered and was not operational. (*Id.* pp. 10-11).  Kevin Bower finally decided to remove the

---

[9]Plaintiff alleges that these four projects do not constitute "virtually every engineering project" for which he was responsible.  However, as discussed in more detail below, it is insufficient for Plaintiff to offer proof that he was meeting part of Buckeye's expectations part of the time.  Rather, Plaintiff must present evidence that he was meeting substantially all of Buckeye's expectations.  *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).

weld line from the manufacturing company, Sotec, and bring it to Buckeye. (*Id.* p. 11) (*citing* Reed Dep. pp. 170-71; K. Bower Dep. pp. 20-22).

The second problem was the weld line itself. ( *Id.*). The steel used to manufacture the line could not withstand Buckeye's demand as evidenced by the fact that it constantly broke down, could barely produce 100 cylinders in a day, and the cylinders it did produce were largely scrap. (*Id.* pp. 11-12) (*citing* T. Bower Dep. pp. 27-30; H. Corbin Dep. pp. 43-47; Reed Dep. pp. 158, 173-75).

In order to remedy these problems, Buckeye had to rebuild each station of the weld line. (*Id.* p. 12) (*citing* T. Bower Dep. pp. 27-30; H. Corbin Dep. pp. 43-47; Reed Dep. pp. 158, 173-75; K. Bower Dep. pp. 54-57). As a result of this rebuilding, Buckeye incurred additional, unplanned expenses and the line was not even operational when Plaintiff went out on leave in January 2001. (*Id.* p. 13). In fact, the line was not reassembled until May 2001. (*Id.*).

Plaintiff admits that the weld line never performed to the Company's expectations. (Reed Dep. pp. 171-75, 272-73, 281-83). Plaintiff further acknowledges that the weld line was "extremely costly" to Buckeye due to the high volume of scrap cylinders. ( *Id.* pp. 281-83). Reed further notes that the rebuilding process took "way longer than it was supposed to" and that the line was not even reassembled until May 2001. ( *Id.* pp. 173-74). Plaintiff attempts to justify the results of his actions with regard to the weld line by stating that he was in touch with the Bowers on a daily basis regarding any major problems with the line. ( *Id.* pp. 157-58).

## ii. Pressure gauge assembly machine

In 1999, Buckeye purchased and installed a gauge assembly machine. (Defs.' Mem. in Supp. pp. 13-14). This machine did not work properly because the gauge alignment

malfunctioned.  (*Id.* p. 13) (*citing* T. Bower Dep. p. 39-40; K. Bower Dep. pp. 19-20; H. Corbin Dep. pp. 23, 37-39).  The alignment function was controlled by a laser sensor selected by Plaintiff.  (*Id.*) (*citing* H. Corbin Dep. pp. 23, 37-39, Reed Dep. pp. 265-68, 278-80).  However, the laser sensor chosen by Plaintiff continually malfunctioned, thereby keeping Buckeye from producing as many gauges as it needed. (*Id.*) (*citing* T. Bower Dep. pp. 39-40; K. Bower Dep. pp. 19-20; H. Corbin Dep. pp. 23, 37-39; Reed Dep. pp. 265-68, 278-80).  Howard Corbin advised Plaintiff about the problems associated with the laser alignment system. ( *Id.* p. 13) (*citing* H. Corbin Dep. pp. 23, 37-39; Reed Dep. pp. 265-68, 278-80; Reed Dep. Exh. 4).  To remedy the problem, Buckeye had to replace the sensor at a cost of $17,000. (*Id.* p. 14) (*citing* K. Bower Dep. pp. 19-20, 122-23).

Plaintiff admits that he was responsible for selecting a laser sensor for the gage assembly machine.  (Reed Dep. pp. 265-68, 278-80).  Moreover, Reed acknowledges that Howard Corbin advised him about the problems associated with the laser alignment system. ( *Id.* Exh. 4).  However, as justification for this malfunction Plaintiff explains that the sensor on the gauge assembly machine just needed to be repaired, which Plaintiff attempted to do but he was prevented from completing the repair due to his injury.  (Defs.' Mem. in Supp. p. 21) ( *citing* Reed Dep. pp. 266-68; 278-79).

### iii.    Labeling machine

In 1997, Buckeye purchased an automated fire extinguisher fill line. ( *Id.* p. 14) (*citing* T. Bower Dep. pp. 15-16).  At the time of this purchase, Plaintiff encouraged Thomas Bower to include a labeling machine as a component of the fill line. ( *Id.*) (*citing* T. Bower Dep. pp. 33-37, 86-88; Reed Dep. pp. 117-80).  Consequently, Buckeye paid an additional $65,000 for the

labeling machine, which was delivered in May 1998. ( *Id.*). According to Defendants, this labeling machine never worked, despite multiple repair efforts. ( *Id.*) (*citing* T. Bower Dep. pp. 33-37, 86-88; K. Bower Dep. pp. 15-16, 73-74; H. Corbin Dep. pp. 23-24).

With regard to the label machine, Plaintiff admits that this equipment was difficult to set up and no one else could repair it while he was out on medical leave. ( *Id.* p. 21) (*citing* Reed Dep. p. 260; Pl. Resp. to Interr. 16; H. Corbin Dep. pp. 23-24).

### iv. Box assembly machine

Finally, in 2000, Plaintiff purchased a box assembly machine to add to the fill line. ( *Id.*) (*citing* K. Bower Dep. pp. 15-17). As admitted to by Plaintiff, this machine did not work properly because the glue did not adhere to the boxes. (*Id.*) (*citing* Reed Dep. pp. 182-83; K. Bower Dep. pp. 15-17, 125; B. Bower Dep. pp. 18-19, 28). As a result, on several occasions the fire extinguishers fell out of the boxes when customers received them. ( *Id.* pp. 14-15) (*citing* Reed Dep. pp. 180-83; K. Bower Dep. pp. 15-17, 125; B. Bower Dep. pp. 18-19, 28). These problems lasted from approximately 2000 to 2003, and resulted in Buckeye losing thirty customers temporarily and five to ten customers permanently. ( *Id.* pp. 15) (*citing* K. Bower Dep. pp. 15-16; B. Bower Dep. pp. 18-19, 28). Despite his admission that the box machine had difficulty during the warmer months, Plaintiff maintains that once he contacted the manufacturer, the flaws were fixed. (*Id.* p. 22) (*citing* Reed Dep. pp. 180-82).

### v. Reed's personal habits

In addition to the ongoing problems with various machines and engineering projects for which Reed was responsible, Reed's conduct at work did not meet Buckeye's expectations. (Defs.' Mem. in Supp. pp. 15-16) (*citing* T. Bower Dep. pp. 88-93; K. Bower Dep. pp. 75-80,

122-23). For example, despite a Company smoking policy published in a memo by Reed while acting as General Manager, Plaintiff continuously ignored Buckeye's smoking policy by taking long smoking breaks throughout the workday. (*Id.* p. 15) (*citing* K. Bower Dep. pp. 75-77; Reed Dep. pp. 96-99). Moreover, Reed would often take another manager from the production floor with him when taking these unauthorized smoke breaks. (*Id.*) (*citing* K. Bower Dep. pp. 75-77). This disregard for the Company's policy frustrated both Tom and Kevin Bower because it set a bad example for other employees and affected production. (*Id.*) (*citing* T. Bower Dep. pp. 88-93; H. Corbin Dep. pp. 34-36).

Reed also frequently arrived to work late and left early, and on several occasions he showed up at work with a hangover and red eyes after staying out most of the night. (*Id.* p. 16) (*citing* K. Bower Dep. pp. 78-79; T. Bower Dep. pp. 91-92). Various employees complained to both Kevin and Tom Bower about Reed's behavior. (*Id.*) (*citing* K. Bower Dep. p. 78; T. Bower Dep. pp. 91-92).

In response to the allegations that Reed violated Buckeye's smoking policy, Plaintiff contends that Brian Bower smoked much more than he did. (Pl. Resp. p. 14) (*citing* Reed Dep. p. 256). However, pointing the finger at a Company owner in justification for his actions does not serve as a denial of Buckeye's contentions regarding *Plaintiff's* poor personal habits at work.

**b.** ***Plaintiff's failure to meet Buckeye's job expectations***

Despite his admissions that many of the projects for which he was responsible did not meet the Company's legitimate expectations and, in fact, resulted in financial loss to Buckeye, Plaintiff maintains that he was meeting Buckeye's legitimate job expectations. In support of this contention, Plaintiff argues that he never received verbal or written warnings or discipline during

his employment at Buckeye. (Pl. Resp. p. 33).  In fact, Plaintiff maintains that he received

positive feedback, as well as merit bonuses and a pay raise. ( *Id.* p. 34).  However, the fact that he

may have at one time been meeting Buckeye's expectations, as evidenced by Plaintiff's receipt of

a merit bonus and a pay increase, is insufficient for Plaintiff to meet his burden on the third

element of his *prima facie* case.

      Significantly, Plaintiff received a salary increase in 1997 and a bonus in 1998, but he did

not receive a pay increase or bonus in the years 1999 or 2000, which were the two years

immediately prior to his termination in 2001. (Reed Dep. pp. 116-17).  Moreover, the fact that

Plaintiff received an increased salary and bonus in 1997 and 1998 respectively is not proof that

he was meeting the Company's expectations in 2001.  It is insufficient for a plaintiff to only offer

proof that he was meeting part of his employer's expectations part of the time; rather, he must

present evidence that he was meeting substantially all of the employer's expectations.

*DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).  Additionally, explanations and

excuses for not meeting the employer's job expectations cannot serve as evidence that the

plaintiff met the required expectations.  *King*, 328 F.3d at 145.  Nor can an employee satisfy his

burden of showing he met his employer's legitimate job expectations by arguing that such

expectations were unreasonable.  A court cannot presume to know how to run a business and

may not require businesses to use only such personnel policies which a court deems to be fair and

reasonable.  *DeJarnette*, 133 F.3d at 298-99.

      Plaintiff further attempts to support his argument that he was meeting Buckeye's

legitimate job expectations by relying heavily on his own opinion and that of his co-worker

Howard Corbin.  Specifically, Plaintiff states that "the single most telling evidence" that he was

meeting the expectations of his employer was the statement of Mr. Corbin who worked with

Plaintiff regularly and stated that he was "shocked" when he was told that Plaintiff - his

"encyclopedia" - had been fired. (Pl. Resp. p. 34). Notably, however, a plaintiff's own opinion

cannot establish a genuine issue as to whether he was meeting *his employer's* expectations.

*King*, 238 F.3d at 149. Similarly, the fact that the plaintiff's coworkers thought he did a good job

or did not deserve to be discharged is essentially irrelevant and does not constitute probative

proof that the plaintiff was meeting the employer's legitimate expectations. *DeJarnette*, 133

F.3d at 299 (*citing Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991));

*King*, 328 F.3d at 149-50.

Plaintiff further emphasizes that since he did not receive negative feedback regarding his

performance, he was obviously meeting the Company's legitimate expectations. [10] Significantly,

though, Buckeye's failure to supply sufficient negative feedback to Plaintiff does not establish

that Plaintiff was meeting the expectations of his employer. [11] As noted by the Fourth Circuit:

> If supervisors fail to supply enough criticism, they may be accused of a lack of
> feedback. If they criticize too much, they may be accused of discriminatory
> harassment. Either way they may find themselves hauled into court to answer for
> their choice. . . . [E]mployment discrimination law is not a vehicle for substituting
> the judgment of a court for that of the employer.

*Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000) (*quoting Jiminez v. Mary Washington*

*College*, 57 F.3d 369, 377 (4th Cir. 1995)). While this type of evidence may tend to demonstrate

that Plaintiff's termination was arbitrary or unreasonable, it does not reflect any intent to

---

[10]In support of this argument, Plaintiff points to cases from the Northern District of Illinois. (Pl. Resp. p.
33-34). The Fourth Circuit, however, has no case law stating that the absence of negative feedback from an
employer is *per se* evidence that an employee is meeting the employer's legitimate job expectations.

[11]In fact, it might be inferred that an absence of a raise or bonus over a two-year period following years
where raises or bonuses were given would be negative feedback.

discriminate on the basis of *age*. *See Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 849 (4th Cir. 1988). "'There is no automatic presumption that every termination of an employee between the ages of 40 and 70 results in a violation of the [ADEA].'" *Goldberg*, 836 F.2d at 849 (*quoting Locke v. Commercial Union Ins. Co.*, 676 F.2d 205, 206 (6th Cir. 1982)).

In sum, since Plaintiff does not have any probative evidence that he was meeting Buckeye's legitimate expectations at the time of his termination, he is unable to establish a *prima facie* case of age discrimination. Consequently, Defendants are entitled to summary judgment on Plaintiff's NCEEPA claim.

**D.     Obstruction of Justice and Civil Conspiracy**

Plaintiff's third claim is titled "Obstruction of Justice - Civil Conspiracy," brought against Defendant Brian Bower. (First Am. Compl. ¶ 4). In support of these claims, Plaintiff alleges that Defendant Brian Bower found a Valentine's Day card and notes from a female in Plaintiff's desk, which Brian discussed with his father, Thomas Bower, and brother, Kevin Bower. (Pl. Resp. p. 29; First Am. Compl. ¶ 20). Plaintiff maintains that Brian Bower, in his capacity as an officer of Defendant Buckeye and in a conspiracy with others at Buckeye, then called Plaintiff and threatened to send the card and notes to Plaintiff's wife if Plaintiff pursued his lawsuit against Defendants. ( *Id.*).[12]

---

[12]Plaintiff further states that this Court is bound by its adoption of the Memorandum and Recommendation dated October 28, 2002, in which the Magistrate Judge found that Plaintiff had sufficiently alleged an injury to public justice sufficient to overcome a motion to dismiss on Plaintiff's obstruction of justice claim. (Pl.'s Resp. p. 30). Despite this Court's adoption of the Memorandum and Recommendation, the Court finds it significant that the Magistrate Judge was ruling on a Motion to Dismiss, which is substantially different than the Motion for Summary Judgment at issue here. Most notably, when considering a motion to dismiss, a court is confined to consideration of only the pleadings, taking all of the facts therein as true. In contrast, when reviewing a motion for summary judgment, although all facts are taken in the light most favorable to the non-movant, a court takes into consideration the pleadings, depositions, answers to interrogatories, and admissions on file, if any, as well as any affidavits.

1.     **Civil conspiracy claim**

In North Carolina there is no such thing as an action for civil conspiracy. *Fox v. Wilson*, 85 N.C. App. 292, 300, 354 S.E.2d 737, 742-43 (1987) (*citing Evans v. Star GMC Sales & Serv., Inc.*, 268 N.C. 544, 151 S.E.2d 69 (1966)).

> . . . [Rather] [t]he action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone. The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof – the damage – not the conspiracy or the combination.

*Id.* (*quoting Reid v. Holden*, 242 N.C. 408, 414-15, 88 S.E.2d 125, 130 (1955)).

A claim for damages resulting from a conspiracy exists where there is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way, which results in damage to the plaintiff. *Lenzer v. Flaherty*, 106 N.C. App. 496, 510, 418 S.E.2d 276, 285 (1992) (*quoting Fox v. Wilson*, 85 N.C. App. 292, 301, 354 S.E.2d 737, 743 (1987)); *see also Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984). In sum, "[a] cause of action for a civil conspiracy under North Carolina law is really an action for damages caused by acts in furtherance of the conspiracy and not for the conspiracy itself." *Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C.*, 226 F. Supp.2d 785, 791 (W.D.N.C. 2002).

In the present case, Plaintiff has failed to establish any evidence that an agreement was reached between Defendant Brian Bower and "others associated with Buckeye" to threaten Plaintiff in an attempt to prohibit the filing of this lawsuit. In fact, when asked what transpired in regard to the conversation between Plaintiff and Defendant Brian Bower, Plaintiff testified as follows:

On January 2, 2002, my son said, 'Your friend Bryan is on the phone.'  I said, 'Bryan?  Bryan who?'  He said, "I don't know."  And so I answered the phone and he said, "This is Bryan Bower."  And he said, he started out by saying, 'What is this crap about this lawsuit or letter that was sent by your attorney?'  And I said to him that I thought the letter was self-explanatory.  And he said to me, he asked me if I was, he says, 'Are you still married?'  And I said, 'Yes, I am.'  And his response was, 'I have this card from this girl and how would you like me to send that to your wife?'  And I said, I said, 'Bryan, I don't know what you are talking about.'  He said, 'Well, let me put it this way.  It would be in your best interests to drop that lawsuit if you know what's good for you.'  And I said, 'Well, I tell you what I'm going to do, Bryan.  The minute I get off this phone I'm calling my attorney and letting him know what conversation just transpired.'  And that was the end of our conversation.

(Reed Dep. pp. 229-30).  Even assuming Brian Bower threatened Plaintiff, Plaintiff has not

presented any evidence that such threat was part of an agreement that Brian Bower had with any

other individual associated with Buckeye.

In contrast, when asked if he had an agreement with Thomas Bower to make the phone

call to Plaintiff regarding the demand letter, Defendant Brian Bower stated, "no" and further

denied having any discussion with Thomas Bower or anyone else associated with Buckeye about

making the phone call or his intent to make that phone call.  (B. Bower Dep. p. 22).  Plaintiff did

not rebut this testimony.  Therefore, all of the evidence in this case demonstrates that there was

no such agreement between Defendant Brian Bower and any other individual associated with

Buckeye.  (T. Bower Dep. pp. 99, 109-11; B. Bower Dep. pp. 8-13, 22-24).  Plaintiff's mere

allegation, without more, relies only upon his suspicion and conjecture, which is insufficient to

overcome a motion for summary judgment.  *See Jackson*, 226 F. Supp. 2d at 791 (finding

plaintiff's suspicion and conjecture insufficient to overcome defendant's motion to dismiss).

In sum, even taking the facts in the light most favorable to Plaintiff, there cannot be a

conspiracy where there has been no showing that Defendant Bower conspired with anyone

associated with Buckeye to threaten Plaintiff, and all Plaintiff has in support of his civil

conspiracy claim is a conclusory allegation. Therefore, Defendants' Motion for Summary

Judgment is granted with respect to Plaintiff's civil conspiracy claim. [13]

## 2. **Obstruction of justice claim**

Obstruction of justice is a common law offense in North Carolina. *Broughton v.*

*McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003) (internal

quotations omitted). Specifically, "'it is an offense to do any act which prevents, obstructs,

impedes or hinders public or legal justice.'" *Id.* (*quoting Burgess v. Busby*, 142 N.C. App. 393,

408-09, 544 S.E.2d 4, 12-13, *reh'g denied*, 355 N.C. 224, 559 S.E.2d 554 (2001)). Thus, to

maintain a claim of obstruction of justice, a plaintiff must present evidence that his case was in

some way judicially prevented, obstructed, impeded or hindered by the acts of the defendant. *Id.*

(granting summary judgment where plaintiff failed to present evidence that her case was

judicially prevented, obstructed, impeded or hindered by the defendants).

Plaintiff here alleges that Defendant Brian Bower's conduct of threatening to disclose to

Plaintiff's wife a personal communication from another female if Plaintiff pursued this lawsuit

constituted obstruction of justice. (First Am. Compl. ¶ 20). However, Plaintiff admits that Brian

Bower's phone call did *not* prevent, obstruct, impeded or hinder his plan to sue Buckeye. (Reed

Dep. pp. 226-33). Specifically, Reed stated that Brian Bower did not deter him from filing this

lawsuit but instead made Plaintiff more determined than ever to file suit. ( *Id.* p. 230).

Consequently, Plaintiff has not established that he was judicially prevented, obstructed, impeded

---

[13]This Court will not address whether the intra-corporate immunity defense is applicable in to case at bar, as such discussion is not pertinent to the Court's finding on this claim.

or hindered by the acts of Defendant Brian Bower.  Therefore, Plaintiff cannot establish a claim for obstruction of justice and Defendants are entitled to judgment as a matter of law on this claim.

## III.  CONCLUSION

For the above-stated reasons, the Court concludes that there is no disputed genuine issue of material fact and Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment is hereby **GRANTED**.

Signed: March 22, 2006

Richard L. Voorhees
Chief United States District Judge